2023 IL App (1st) 221048-U

FIFTH DIVISION
June 9, 2023

Nos. 1-22-1048, 1-22-1167
Consolidated

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| *In re* L.W., | ) | Appeal from the |
|     Minor-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
| | ) | No. 16 JA 240 |
| | ) | |
| | ) | Appeal No. 1-22-1167 |
| | ) | |
| (Marc D. Smith, Director of the Department of | ) | Honorable |
| Children and Family Services, Contemnor-Appellant). | ) | Patrick Murphy |
| | ) | Judge Presiding. |

| | | |
|---|---|---|
| *In re* R.E., | ) | Appeal from the |
|     Minor-Appellee, | ) | Circuit Court of |
| | ) | Cook County |
| | ) | |
| | ) | No. 21 JA 1068 |
| | ) | |
| | ) | Appeal No. 1-22-1048 |
| | ) | |
| (Marc D. Smith, Director of the Department of | ) | Honorable |
| Children and Family Services, Contemnor-Appellant). | ) | Patrick Murphy |
| | ) | Judge Presiding. |

JUSTICE LYLE delivered the judgment of the court.
Presiding Justice Delort and Justice Mitchell concurred in the judgment.

**ORDER**

Nos. 1-22-1048, 1-22-1167 (Consolidated)

¶ 1   *Held*:   The trial court's judgment finding the Director of the Department of Children and Family Services in indirect civil contempt was an abuse of discretion (1-22-1048). The appeal in 1-22-1167 is dismissed for lack of jurisdiction.

¶ 2   This consolidated appeal of these two cases arises from the circuit court of Cook County's orders finding the appellant, Marc D. Smith, who is the director of the Department of Children and Family Services (DCFS), in indirect civil contempt of court. The contempt finding was imposed on Director Smith for not finding appropriate placements for the two minors in question as ordered by the trial court. On September 16, 2022, this court consolidated these cases on appeal because of the similar fact patterns and findings by the trial court. In both cases, the Office of the Public Guardian of Cook County filed petitions for rules to show cause on behalf of the minors. After the trial court issued the rules to show cause and subsequent hearings, the court entered indirect civil contempt findings against Director Smith. In each case, the court fined Director Smith $1000 per day and stated that the purge condition was to find appropriate placement for each minor.

¶ 3   On appeal, Director Smith argues that the circuit court erred by: (1) finding that he should be held in indirect civil contempt in each case; and (2) alternatively finding that the consent decree in *B.H. v. Smith*, 88-C-5599 (N.D. Ill. 1997), an unrelated case, did not bar the court from finding him in contempt. For the following reasons, we reverse the finding in 1-22-1048 and dismiss the appeal in 1-22-1167.

¶ 4                                    BACKGROUND

¶ 5   We state only the facts necessary to resolve this consolidated matter. For a full recitation of the background of the beyond medical necessity (BMN) call and the issue of youth in the care of DCFS who remained in psychiatric hospitals and residential treatment facilities beyond their

discharge date, see *In re J.S.*, 2022 IL App (1st) 220083. The relevant facts of each of the cases involving the two minors are outlined below.

¶ 6                                    Appeal No. 1-22-1048: *In re* R.E.

¶ 7     On November 16, 2021, the Cook County State's Attorney's Office filed a petition for adjudication and wardship and a motion for temporary custody of the minor, R.E., who was 15 years old at the time of the filing of the petition. Around September 4, 2021, R.E. was psychiatrically hospitalized at Hartgrove Hospital due to aggressive behavior and suicidal ideations. R.E. was previously hospitalized and diagnosed with schizoaffective disorder, bipolar disorder, anxiety disorder, and oppositional defiant disorder. R.E.'s mother also disclosed that R.E. was previously sexually abused by a family member and R.E. had witnessed domestic violence between her mother and her mother's paramours. On November 16, 2021, the trial court took temporary custody of R.E. and appointed DCFS as the temporary guardian of the minor. In November 2021, DCFS deemed that the recommended level of care for R.E. was a residential treatment facility.

¶ 8     On January 14, 2022, Hartgrove Hospital determined R.E. was ready for discharge. Even though the hospital determined she was ready for discharge, R.E. was still having psychotic episodes. Based on the recommendation of a residential treatment facility, DCFS made referrals to Lydia Home, Nexus Indian Oaks, Norman C. Sleezer Youth Home, Uhlich Children's Advantage Network (UCAN), and Pavilion. Each of the facilities declined R.E. for placement for various reasons. Norman C. Sleezer Youth Home declined her for placement citing staffing shortages, and Lydia Home and Nexus Indian Oaks declined her due to concerns about the level of care she would require. Some residential treatment facilities requested that R.E. undergo

additional testing to assess her Intelligence Quotient (IQ), concerned that it was lower than originally documented.

¶ 9 On February 22, 2022, the GAL for R.E. filed a motion to compel DCFS to place R.E. in a residential treatment facility. During the hearing on the motion, DCFS's Central Area Administrator, Yolanda Walton, stated that Pavilion and Nexus Indian Oaks declined her and asked for additional psychological testing for R.E. based on her presentation during the interview process. Ms. Walton stated that, due to that request, R.E. was scheduled for an updated psychological examination on March 1, 2022. DCFS requested a continuance of the hearing to wait for the psychological examination to be completed. Instead, on February 24, 2022, the trial court granted the GAL's motion and required DCFS to place R.E. "in a clinically appropriate placement by March 5, 2022."

¶ 10 On March 14, 2022, the GAL filed a petition for a rule to show cause, alleging that DCFS violated the trial court's February 24, 2022, order to place R.E., since R.E. remained hospitalized. On March 17, 2022, the trial court conducted a hearing on the petition for a rule to show cause. R.E.'s caseworker testified that the updated testing showed that R.E. had cognitive delays and an IQ of 48. Based on those results, DCFS referred R.E. to three additional residential treatment facilities—Maryville Academy, Hoyleton Youth & Family Services (Hoyleton), and Allendale Association. R.E.'s caseworker said she was in the process of setting up interviews with those facilities. After the hearing, the trial court issued the rule to show cause.

¶ 11 On April 14, 2022, the trial court commenced a contempt hearing. Alicia Ozier, DCFS's Deputy Director of Clinical Practice, testified that DCFS had tried to assess R.E.'s needs in terms of level of care and also medication regimen. Jacquelyn Dortch, DCFS's Deputy Director of Child

Services, explained DCFS's efforts to place R.E. She testified that Hoyleton placed R.E. on a waiting list with an anticipated wait time of 45 to 60 days, but DCFS was making efforts to shorten that duration by transferring out youth, who had completed Hoyleton's program, to less restrictive placements. When Ms. Dortch tried to have Maryville Academy assess R.E. for placement, Maryville Academy reported that she was going in and out of psychosis and that she needed to be medically stabilized before they would consider her for placement. Like Maryville Academy, other facilities expressed concern about her level of psychosis and the effectiveness of her medication dosage. The trial court continued the hearing for a week.

¶ 12    After the continuance, DCFS stated that Maryville Academy completed its second interview with R.E. and had accepted her for placement. Maryville Academy anticipated that she would be placed on June 15, 2022. Ms. Dortch testified that Maryville Academy wanted to take a slower approach to her transition to the residential treatment facility due to her history of hospitalizations, suggesting that a more gradual stepdown would be beneficial for R.E. The trial court continued the case to June 9, 2022, to monitor the progress of the transition. The day after the court entered the continuance order, the GAL filed an emergency order to advance and reset the contempt hearing, challenging DCFS's representations to the court that R.E. was accepted into Maryville Academy.

¶ 13    On May 12, 2022, the trial court held a hearing on the motion order to advance and reset the contempt hearing. Ms. Dortch testified that Maryville Academy conditioned its acceptance of R.E. on five pre-placement criteria. Those criteria were that: (1) DCFS's and Hartgrove Hospital's physicians would work collaboratively with Maryville Academy's physicians to finalize a medication plan for R.E.; (2) Maryville Academy's clinical social worker would meet weekly with

R.E. to facilitate her transition; (3) R.E.'s mother would participate in a preplacement child and family meeting; (4) DCFS would engage with Maryville Academy weekly regarding R.E.'s progress toward placement; and (5) DCFS would step down other youth who completed Maryville Academy's residential program to less restrictive placements to allow Maryville Academy to have the allocation of staff and resources to safely meet R.E.'s needs. The court continued the case until May 19, 2022, for a hearing on whether Director Smith of DCFS should be held in contempt of court. On May 19, 2022, after briefly hearing testimony, the court determined it was not given enough information to come to a decision and continued the hearing to June 2, 2022.

¶ 14    On June 2, 2022, Ms. Walton testified that it appeared that R.E.'s physicians found the correct medication regiment for R.E. and she has been doing well. She stated that DCFS is making great progress toward meeting the checklist that Maryville Academy put in place. The trial court said the only question that mattered was "[h]as she been accepted or not." DCFS stated that Ms. Dortch would testify in response to that inquiry.

¶ 15    Ms. Dortch testified that while she was not "accepted," DCFS had met all the preplacement criteria for R.E. to be accepted into the program. DCFS planned on R.E. being admitted to Maryville Academy on June 15, 2022. She acknowledged that the four children still needed to move out of Maryville Academy to make room for R.E. but they had plans in place to move them to step-down placements. One of those minors had a placement date of June 15, 2022, but they were still awaiting dates for the other three.  She testified that people were overly focused on the word "accepted" but that every placement for minors has pre-placement conditions, implying that R.E.'s situation was not out of the ordinary. She also disputed the representation that R.E. has been in Hartgrove Hospital beyond medical necessity since January 2022, because the discharge was

due to R.E.'s Medicaid benefits running out not that her level of psychiatric need had decreased. She was still actively psychotic until a medication adjustment in April 2022. The court continued the matter until June 23, 2022, eight days after R.E. was supposed to be placed. The record does not contain a transcript of the proceedings on June 23, 2022, if any occurred. A continuance order, entered on June 23, 2022, shows the case was continued to July 2, 2022.

¶ 16    On July 2, 2022, the trial court conducted a hearing on whether Director Smith should be held in contempt. Ms. Dortch testified that all the criteria for placement had been met except for moving the four minors out of Maryville Academy. She discussed the plans for each minor, explaining that three of them were supposed to be placed by July 26, 2022. The other minor was supposed to go to a foster placement but there was not a set date. She expected R.E. to be placed at Maryville Academy the week of July 25, 2022. Ms. Dortch stated R.E.'s condition has been stable since May 2022. She testified that at the time of the hearing, they were not concurrently working on other placement plans for R.E. because DCFS believed that the Maryville Academy placement was the most clinically appropriate placement for R.E. and other facilities had declined her due to her clinical needs. She explained that no order entered by the trial court could expedite the process for R.E. to be placed at Maryville Academy. When asked by the trial court when the children, who were being stepped down from Maryville Academy, became ready for discharge to a less restrictive environment, Ms. Dortch could not answer that question.

¶ 17    After arguments, the trial court held Director Smith in indirect civil contempt of court fining DCFS $1,000 a day until R.E. was in her placement but staying the fine until July 28, 2022. The trial court added that it would vacate the finding if R.E. was placed by July 28, 2022.

¶ 18    In the trial court's July 7, 2022, written order, the court noted the systemic issues with DCFS, which affected minors across the state. However, it stated that the *specific* reason for the indirect civil contempt finding against Director Smith was DCFS's failure to comply with the court's direct order to facilitate an appropriate residential placement for R.E. and "ignoring the court's orders to place the child appropriately." In its written order, the court noted that there were many cases involving minors being held at psychiatric hospitals beyond medical necessity. The court stated, "Director Smith can purge himself of the contempt by removing [R.E.] from the psychiatric hospital and placing her appropriately." The court reiterated that the fine was stayed until July 28, 2022. On July 15, 2022, Director Smith filed his notice of appeal.

¶ 19                            Appeal No. 1-22-1167: *In re* L.W.

¶ 20    On March 14, 2016, DCFS was appointed the temporary guardian of L.W., when she was five years old. In the petition for adjudication of wardship, the State alleged that L.W. and her sibling were physically abused by her mother's paramour, and her mother and her mother's paramour had engaged in domestic violence between themselves.

¶ 21    On February 1, 2022, L.W. was admitted to Hartgrove Hospital after allegedly stabbing her foster parent a couple of days prior. Prior to the alleged stabbing incident, L.W. lived with her maternal grandmother but then ran away from the home for a few days and was subsequently put in a nonrelative foster home.  On February 24, 2022, Hartgrove Hospital determined that L.W. was ready for discharge and the placement plan for her, at that time, was to return home to her maternal grandmother. The clinical recommendation after each of the three clinical staffings was placement at a residential treatment facility. Prior to her hospitalization in February 2022, L.W. was in 16 different "placements," including multiple hospitalizations.

¶ 22    On April 18, 2022, L.W.'s GAL filed a petition for a rule to show cause why Director Smith should not be held in indirect civil contempt of court. In the petition for a rule to show cause, the GAL alleged that, on April 12, 2022, L.W. was hospitalized after having suicidal ideations and attempting to take her own life. On April 14, 2022, the trial court ordered L.W. to be placed in an appropriate secure residential treatment facility or an appropriate psychiatric hospital. On April 16, 2022, she was sent back to Aunt Martha's Integrated Care Center where she was living prior to the suicide attempt. In the petition, it referred to prior testimony heard by the trial court that psychiatric hospitals were nervous to take in DCFS youth because they often were not stepped down from their hospitalization in a timely manner.

¶ 23    After a hearing on May 12, 2022, the trial court issued the rule to show cause. On May 19, 2022, the trial court held a contempt hearing. After the hearing, the trial court issued an oral ruling finding Director Smith in indirect civil contempt of court. On that date, the court entered a written order fining Director Smith $1,000 per day and staying the fine accrual until June 2, 2022. The written order in L.W.'s case mirrored the order in R.E.'s case, in that the trial court stated Director Smith was being held in contempt for ignoring the trial court's order to place L.W., which was entered on April 14, 2022. A notice of appeal was not filed within thirty days.

¶ 24    On July 14, 2022, the trial court entered an order modifying the fine from $1,000 per day to $1 per day and stayed the fine until August 1, 2022. On July 22, 2022, Director Smith and DCFS filed a notice of appeal challenging the May 19, 2022, order and the July 14, 2022, order.

¶ 25    We also acknowledge Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018), which provides that, for an appeal involving the custody of a minor, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal."

Director Smith filed his notice of appeal in the first case of these consolidated cases on July 15, 2022. Therefore, because this consolidated matter involves the custody of minors, our order in this matter was due in December 2022. However, given the similarity of issues in these two cases, this court granted a motion to consolidate the cases for a more efficient resolution of these two appeals. Both parties requested extensions of time to file their opening briefs. Director Smith filed his reply brief on February 28, 2023, and shortly thereafter, on March 9, 2023, the State's Attorney's Office filed a letter of non-intent to file an appellee brief. Accordingly, there was good cause for the delay in the resolution and issuance of our order in these consolidated cases.

¶ 26                                    ANALYSIS

¶ 27    Before addressing the merits, we have an obligation to consider whether this court has jurisdiction to consider this consolidated matter. Although jurisdiction was not raised by the parties, "courts of review have an independent duty to consider jurisdiction." *People v. Lewis*, 234 Ill. 2d 32, 36 (2009). Jurisdiction grants a court the power to interpret and apply the law. *In re M.W.*, 232 Ill. 2d 408, 414 (2009).

¶ 28    "An order finding a person or entity in contempt of court which imposes a monetary or other penalty" vests jurisdiction in the appellate court if it complies with the 30-day filing deadline in Illinois Supreme Court Rule 303. Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016).

¶ 29    In L.W.'s case (1-22-1167), the trial court entered an order finding Director Smith in contempt and sanctioning him with a $1,000 fine on May 19, 2022. The order was immediately appealable, and Director Smith had 30 days to appeal that order. *In re Sivels*, 2022 IL App (1st)

210346 (unpublished order under Supreme Court Rule 23)[1]. However, he waited until after the trial court modified the sanction to file a notice of appeal, which was filed on July 22, 2022. At that point, the 30-day window to file a timely notice of appeal had expired. In his jurisdictional statement, Director Smith points to the July 14, 2022, order modifying the sanction, as the order which grants him jurisdiction to challenge the May 19, 2022, order. However, the timing of his notice of appeal just provides this court jurisdiction to review the modified sanction not the order which originally imposed it. Therefore, we lack jurisdiction to consider the May 19, 2022, order and since Director Smith does not challenge the modification that argument is forfeited. Ill. S. Ct. R. 341(e)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). We, therefore, dismiss the appeal in docket number 1-22-1167.

¶ 30    However, in R.E.'s case (1-22-1048), Director Smith filed a timely notice of appeal, and thus, this court has jurisdiction to consider the appeal. Ill. S. Ct. R. 304(b)(5) (eff. Mar. 8, 2016); Ill. S. Ct. R. 303 (eff. July 1, 2017).

¶ 31    Turning to the merits of this appeal (1-22-1048), Director Smith argues that the trial court erred by finding him in indirect civil contempt. Director Smith makes two central arguments. First, Director Smith argues that DCFS made a concerted effort to find an appropriate placement for R.E. when ordered to do so by the court but were unable to place her in a necessary and appropriate placement within the time parameters set by the trial court. He asserts that he should not have been held in contempt given the obvious efforts made by DCFS to comply with the trial court's order.

---

[1]Unpublished orders from the Illinois Appellate Court entered after January 1, 2021, may be cited for persuasive purposes. Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021).

Alternatively, Director Smith argues that the *B.H.* consent decree bars the trial court from entering a contempt finding in this case based on the systemic failures of DCFS. Director Smith goes on to assert that the trial court's order addresses systemic issues. We first address the trial court's contempt finding.

¶ 32                                    Contempt Finding

¶ 33    A court is vested with inherent power to enforce its orders and preserve its dignity by the use of contempt proceedings." *People v. Warren*, 173 Ill. 2d 348, 368 (1996). "The type of contempt at issue in any given case determines the procedure that must be followed in a contempt proceeding." *J.S.*, 2022 IL App (1st) 220083, ¶ 70 (citing *In re A.M.*, 2020 IL App (4th) 190645, ¶ 13). "Accordingly, contempt may be either direct or indirect and civil or criminal." *J.S.*, 2022 IL App (1st) 220083, ¶ 70. "The existence of an order of the court and proof of willful disobedience of that order are essential to any finding of indirect contempt." *In re Marriage of Spent*, 342 Ill. App. 3d 643, 653 (2003). Indirect contempt "covers the entire range of [contumacious] conduct which does not occur in open court or in a constituent part of the court." *In re Marriage of Betts*, 200 Ill. App. 3d 26, 48 (1990).

¶ 34    The primary factor in determining whether a contempt finding is civil or criminal in nature is "the purpose for which contempt sanctions are imposed." *Betts*, 200 Ill. App. 3d at 43. While the purpose of criminal contempt is to punish past misconduct, civil contempt is designed to be coercive in nature and "to compel the contemnor to perform a particular act." *Betts*, 200 Ill. App. 3d at 43. "Civil contempt proceedings have two fundamental attributes: (1) the contemnor must be capable of taking the action sought to be coerced, and (2) no further contempt sanctions are imposed upon the contemnor's compliance with the pertinent court order." *Betts*, 200 Ill. App. 3d

at 44. A valid purge condition is a necessary part of an indirect civil contempt order, and "[a] contemnor must be able to purge the civil contempt by doing that which the court has ordered him to do." *Felzak v. Hruby*, 226 Ill. 2d 382, 391 (2007).

¶ 35    "Initially, the burden falls on the petitioner in a rule to show cause to establish, by a preponderance of the evidence, that the alleged contemnor violated a court order and, therefore, should be held in contempt." *J.S.*, 2022 IL App (1st) 220083, ¶ 72. "Noncompliance with a court order is *prima facie* evidence of contempt." *In re Marriage of Ray*, 2014 IL App (4th) 130326, ¶ 15. "Once that burden is satisfied, the burden shifts to the contemnor, who has the burden of showing that the violation was not willful and contumacious and that he or she had a valid excuse for failing to follow the order." *J.S.*, 2022 IL App (1st) 220083, ¶ 72. "Contumacious conduct consists of conduct calculated to embarrass, hinder, or obstruct a court in its administration of justice or lessening the authority and dignity of the court." (Internal quotation marks omitted.) *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 50. " 'Whether a party is guilty of contempt is a question of fact for the trial court, and a reviewing court should not disturb the trial court's determination unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion.' " *Knoll*, 2016 IL App (1st) 152494, ¶ 50 (quoting *In re Marriage of McCormick*, 2013 IL App (2d) 120100, ¶ 17). "A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the court's findings are unreasonable, arbitrary, and not based on any of the evidence." (Internal quotation marks omitted.) *Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 36    This court reviewed a similar set of circumstances in *J.S.*, 2022 IL App (1st) 220083. In *J.S.*, 2022 IL App (1st) 220083, Director Smith was held in indirect civil contempt of court for

"ignoring" the trial court's orders to place several minors who were in "placements" beyond their medical necessity. This court reversed the contempt judgments finding that the trial court abused its discretion by holding Director Smith in contempt of court because while he failed to place the minors, he and DCFS clearly made efforts to place the minors in question and did not ignore the trial court's orders. *J.S.*, 2022 IL App (1st) 220083, ¶ 83. The analysis in this case runs along the same lines.

¶ 37    In the case before us (1-22-1048), there is no dispute amongst the parties that DCFS *did not comply* with the trial court's February 22, 2022, order to place R.E. in an appropriate residential treatment facility by March 5, 2022. Therefore, a *prima facie* case was made that Director Smith did not comply with the trial court's placement order. The parties dispute, however, whether Director Smith and DCFS were *unable*, through no fault of their own, to place R.E. in an appropriate residential treatment facility in accordance with the court's order. Thus, the parties disagree regarding whether Director Smith met his burden of proving his *inability* to comply with the court's placement orders within the given time parameters.

¶ 38    Director Smith claims he made every possible effort to place R.E. appropriately in accordance with the trial court's orders but circumstances beyond his and DCFS's control prevented her placement within the time mandated by the trial court's order. For example, he cites the fact that DCFS needed to complete an updated psychological assessment for R.E. and, after the assessment was completed, she was accepted by Maryville Academy. On the other hand, the GAL focuses its arguments on various methods that were not employed by DCFS to secure appropriate placements for R.E. in accordance with the trial court's order. The GAL argues vigorously that there were other avenues available to DCFS to secure appropriate placements for

R.E. or if necessary to create one, yet DCFS continued to employ methods which it should have known would not comply with the court's order.

¶ 39    As is appropriate to evaluate the accuracy of the trial court's ruling, our review of the court's contempt finding focuses on the actions of DCFS and Director Smith *after* the date of entry of the court's order relating to appropriate placement of R.E. and before the date on which the trial court found Director Smith in indirect civil contempt. See *J.S.*, 2022 IL App (1st) 220083, ¶ 72 (stating that unlike criminal contempt, civil contempt focuses only on actions taken after the order, with which the party did not comply, is entered). The trial court entered a placement order on February 22, 2022. At the contempt hearing, the court heard testimony from Ms. Dortch about taking R.E.'s placement process to Maryville Academy slowly due to her history of hospitalizations and opined that a gradual transition to a residential treatment facility was in R.E.'s best interest. There was also testimony that Hoyleton put R.E. on its waitlist but DCFS made efforts to secure her a placement faster with Maryville Academy though, in actuality, it took many months for her to be placed. Although the GAL argues that DCFS should have created a placement for R.E. pursuant to section 5(h) of the Children and Family Services Act (20 ILCS 505/5(h) (West 2020)), that is not the criteria upon which we must resolve this appeal (1-22-1048).

¶ 40    In R.E.'s case, the trial court stated the reason for its contempt finding was that Director Smith "ignored" the court's order to place her. While the GAL and the court clearly disagreed with the methods used by DCFS to locate an appropriate placement, by the very acknowledgement of DCFS's ineffective methods, the GAL is acknowledging that DCFS did not *ignore* the trial court's order. Thus, the question we must ask is not whether DCFS chose methods, which would have yielded an appropriate placement within the time prescribed by the court, but whether Director

Smith "willfully ignored" the trial court's order thereby engaging in contumacious conduct. Had the trial court not based its reasoning for the contempt finding on DCFS ignoring the court's order, the analysis would be different. *J.S.*, 2022 IL App (1st) 220083, ¶ 77. However, it did not.

¶ 41    As explained, the record shows that while DCFS's efforts were clearly ineffective, the trial court's order was not ignored. Accordingly, the court's ruling that its order was ignored, thereby resulting in a finding of indirect civil contempt by Director Smith, was erroneous. We find that the trial court abused its discretion in entering finding of indirect civil contempt against Director Smith in R.E.'s case. See *Knoll*, 2016 IL App (1st) 152494, ¶ 50.

¶ 42    As we have found that the trial court abused its discretion by finding Director Smith in indirect civil contempt in R.E.'s case, we need not address whether the consent decree in *B.H.* applies in that case.

¶ 43                                 CONCLUSION

¶ 44    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County in 1-22-1048. We lack jurisdiction to consider the judgment in 1-22-1167, and the appeal is dismissed.

¶ 45    No. 1-22-1048, Reversed.

¶ 46    No. 1-22-1167, Appeal Dismissed.